UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ X
GOLOMB MERCANTILE COMPANY LLC,  :
                            :
           Plaintiff,     :
                            :
   -against-       :
                            :
MARKS PANETH LLP, OPPORTUNIP   :
LLP, and STEVEN L. HENNING,    :
                            :
          Defendants.    :
------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/12/2019

No. 18 Civ. 3845 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF GOLOMB MERCANTILE COMPANY LLC:
    Edward J. Hood
    Steven M. Richman
    Boris Brownstein
    CLARK HILL PLC

FOR DEFENDANT MARKS PANETH LLP:
    Claude M. Millman
    Stephen A. Josey
    KOSTELANETZ & FINK, LLP

FOR DEFENDANT STEVEN L. HENNING:
    Michael K. Burke
    HODGES WALSH & BURKE LLP

**JOHN F. KEENAN, United States District Judge:**

Golomb Mercantile Company LLC ("Golomb"), a Delaware automotive intellectual property owner, brings suit against Marks Paneth LLP ("Marks Paneth"), a New York accounting firm; OpportunIP, LLC ("OpportunIP"), a New York intellectual property broker; and Steven L. Henning ("Henning"), a Connecticut resident, Marks Paneth partner, and senior executive of OpportunIP, for fraud and breach of fiduciary duty.

1

Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  Before the Court are (1) Henning's motion to set aside entry of default against him pursuant to Federal Rule of Civil Procedure 55(c) and (2) Marks Paneth's motion to dismiss the Second Amended Complaint ("the SAC") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b). OpportunIP has not entered an appearance in this action or otherwise responded to the Complaint, and Golomb has already sought and obtained a certificate of default against it.  For the reasons set forth below, Henning's motion is GRANTED.  Marks Paneth's motion is GRANTED in part and DENIED in part.

## I.  Background

The Court takes the following facts and allegations from the Complaint and, for the purposes of these motions, deems them to be true.

Golomb is a Delaware limited liability company with its principle place of business in Las Vegas, Nevada.  (SAC ¶ 2.) Golomb owns intellectual property ("IP"), including automotive patents, and its four members are citizens of Nevada, Illinois (two), and Indiana.  (Id. ¶¶ 2, 27.)  Marks Paneth is a New York limited liability partnership that provides auditing, business advisory, consulting, tax, and other customary accounting services, with its principal place of business in New York City. (Id. ¶¶ 3, 11.)  Henning was a senior partner at Marks Paneth,

2

where he held the role of "Partner-in-Charge" of Marks Paneth's
Advisory Services and also served as a member of the firm's
executive committee and management committee. (Id. ¶¶ 12-13.)
Marks Paneth's Advisory Services practice included advising IP
owners about the potential monetization of their intellectual
property through sale or licensing to third parties. (Id. ¶
14.)

In or around 2008, Marks Paneth formed a New York limited
liability company, MP&S Intellectual Property Associates ("MP&S
IPA"), to promote Henning's idea of an intellectual property
exchange that would bring together owners of IP and potential
purchasers and licensees of such property. (Id. ¶¶ 5, 18.) In
or around 2011, MP&S IPA changed its name to OpportunIP, and
Marks Paneth assigned its member interests in MP&S IPA to
individual Marks Paneth partners. (Id. ¶¶ 21-22.) In addition
to his work as a Marks Paneth partner, Henning also held the
role of managing member and Chief Executive Officer ("CEO") of
OpportunIP and its predecessor, MP&S IPA. (Id. ¶ 19.)

### A. The License Agreement

In June 2012, Golomb's managing member was introduced to
Henning and a second Marks Paneth representative, Glenn Sacks
("Sacks"). (Id. ¶ 26.) Henning and Sacks held themselves out
as representatives of both Marks Paneth and OpportunIP, and each
provided Golomb with their Marks Paneth and OpportunIP business

3

cards.  (Id. ¶ 28.)  When asked what email address Golomb should use to communicate with them, Henning replied "either one," giving Golomb the impression that Marks Paneth and OpportunIP were a single entity.  (Id.)  Neither Henning nor Sacks communicated to Golomb that Marks Paneth and OpportunIP were separate entities.  (Id. ¶ 29.)

Henning and Sacks proposed that Golomb provide OpportunIP with an exclusive license to market Golomb's IP to interested purchasers or licensors and, in their sales pitch, they emphasized Marks Paneth's depth of research, diverse client base, and industry contacts to help Golomb monetize its IP. (Id. ¶¶ 30-31.)  Golomb conducted due diligence into Marks Paneth, Henning, and Sacks by reviewing information on the Marks Paneth website regarding their credentials and experience with intellectual property.  (Id. ¶¶ 32-33.)

On or around August 15, 2012, Golomb entered into a license agreement with OpportunIP ("the Agreement") which authorized OpportunIP to sublicense or sell Golomb's IP.  (Id. ¶ 34.) Golomb asserts that it would not have entered into the Agreement if Henning and Sacks had not described OpportunIP as being backed by and a part of Marks Paneth and had they not presented OpportunIP and Marks Paneth as an integrated entity.  (Id. ¶ 36.)

The Agreement[1] was between Golomb as "Licensor" and OpportunIP as "Licensee"—it contains no reference to Marks Paneth.  (Ex. 1 to Decl. of Claude M. Millman ("License Agmt."), ECF No. 53-1, at 1.)  Pursuant to § 1.1(a) of the Agreement, Golomb granted "an exclusive license" of its IP to OpportunIP "and its Affiliates."  (Id.)  Section 1.1(d), however, expressly reserved Golomb's right to license the same IP to "a third party that in [Golomb's] reasonable discretion is a suitable licensee."  (Id.)  To invoke this "License Back to Licensor" clause, Golomb was required to provide OpportunIP with 30 days' notice "prior to exercising [its] grant-back rights."  (Id. § 1.1(d).)  The Agreement also stated that OpportunIP "shall have no obligation to sublicense the [IP]," and it allowed either party to terminate the Agreement after an initial 30-day period.  (Id. at 3 § 3.1.)

The Agreement's fine print provided that OpportunIP was "not acting as an agent, partner, joint-venturer, employee, or general representative of [Golomb]," and OpportunIP did "not

_____

[1] The Agreement was not attached to the SAC.  Defendants, however, provided a copy with their motion to dismiss which the Court recognizes because the Agreement is incorporated in the SAC by reference and it is integral to the SAC. See Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint.").

guarantee that it will be able to identify a sublicensee." (Id.
at 11 § 3.4.) And, "even if [OpportunIP] d[id] identify a
sublicensee, [OpportunIP] d[id] not guarantee that it will
negotiate a sublicense on acceptable terms." (Id.) The fine
print also included an "Entire Agreement" clause that stated:
"This Agreement . . . constitutes the entire agreement between
the parties regarding the subject matter" and it "may not be
modified except in a document signed by duly authorized
representatives of each party." (Id. at 14 § 9.1.)

Finally, the Agreement included an arbitration clause that
stated: "[A]ny controversy or claim arising out of or relating
to this Agreement, or the breach thereof, shall be submitted to
non-binding arbitration . . . before the parties may initiate
arbitration, litigation or some other type of binding dispute
resolution process." (Id. at 4 § 6.2.)

The SAC alleges that the Agreement continued until July
2017, when it was canceled by Golomb in accordance with its
terms. (SAC ¶ 35.) The SAC further alleges that, as part of
their business relationship, Golomb reposed faith, trust, and
confidence in OpportunIP, Henning, and Marks Paneth to act in
Golomb's best interests and with integrity and fidelity, and
that all three defendants benefitted from the relationship
because Golomb was a prototypical client for the three
defendants' burgeoning IP monetization advisory and brokerage

services.  (Id. ¶¶ 37-39.)  That trust, however, was betrayed by a series of frauds that Henning perpetrated over a four-year period.  (Id. ¶ 40.)

## B.  Henning's Fraudulent Communications

Beginning in November 2012, and continuing through at least October 2016, Henning fabricated numerous emails between himself and representatives of Ford Global Technologies, Volkswagen AG, Mercedes-Benz, Renault, and Nissan to make it appear that global automobile manufacturers had strong interest in licensing or buying Golomb's IP.  (Id. ¶¶ 41-43, 51-53, 60-62, 68.)  Henning forged signatures on fake lease agreements and shared fictitious emails with Golomb in order to deceive it into believing that multi-million-dollar deals were imminent with the manufacturers.  (Id. ¶¶ 42, 46, 52, 56, 61, 65, 68.)  The purported interest in Golomb's IP, however, did not exist.  (Id. ¶¶ 50, 59, 70.)

The SAC alleges that Henning perpetrated the fraud principally using his Marks Paneth email account, and he also utilized equipment belonging to Marks Paneth, such as one of its scanners.  (Id. ¶¶ 42, 47, 52, 61.)  The SAC further alleges that Henning's actions were taken in both his individual capacity and within the course and scope of his duties as the CEO of OpportunIP and the Partner-in-Charge of Marks Paneth's Advisory Services.  (Id. ¶¶ 44, 54, 63, 74-76.)

Relying on the false and fraudulent information that

Henning provided, Golomb incurred hundreds of thousands of
dollars in professional fees "fortifying and maintaining" its IP
in the United States and seeking similar patents
internationally.  (Id. ¶ 71.)  Henning expressly encouraged
Golomb to undertake such investments to strengthen and expand
its IP.  (Id.)  Golomb also incurred legal fees evaluating and
negotiating false documents that Henning provided.  (Id.)
Finally, the SAC alleges that Golomb sustained damages in the
form of five years of lost opportunities during which Golomb
could have marketed and sold or licensed its IP.  (Id. ¶ 72.)

On April 30, 2018, Golomb filed the initial complaint in
this action (ECF No. 1), and on May 1, 2018, it filed an amended
complaint ("the FAC") to correct errors with the initial filing
(ECF No. 9).  On July 23, 2018, Golomb filed the SAC, which
added allegations relating to the faith, trust, and confidence
that Golomb reposed in Henning, OpportunIP, and Marks Paneth.
(ECF No. 32.)

The SAC alleges common law fraud and breach of fiduciary
duty against all three defendants and asserts that OpportunIP is
liable for Henning's fraudulent acts because Henning's conduct
was within the course and scope of his duties as its CEO (SAC ¶
75), and that Marks Paneth is liable because OpportunIP was the
alter ego of the firm's Advisory Services, or, in the
alternative, Henning's fraudulent acts were within the course

and scope of his duties as a Marks Paneth partner (id. ¶¶ 74,
77-78). Golomb seeks joint and several liability against all
three defendants and claims compensatory and punitive damages.

**II. Henning's Motion to Set Aside Default**

On May 29, 2018, a summons was served on Henning together
with the FAC by unsuccessfully attempting service five times at
Henning's permanent residence and, ultimately, posting the
papers to his door. (Ex. A to Decl. of Edward J. Hood ("Hood
Decl."), ECF No. 79-1.) Henning did not answer or respond to
the FAC. On September 10, 2018, an amended summons was served
on Henning together with the SAC in the same manner. (Ex. B to
Hood Decl., ECF No. 79-2.) Henning did not answer or respond to
the SAC either.

On October 12, 2018, the U.S. Attorney's Office for the
Southern District of New York (White Plains) charged Henning
with wire fraud for allegedly fraudulently inducing certain
individuals to invest approximately $2 million into OpportunIP.[2]
(See United States v. Henning, 18 Cr. 859 (CS), Dkt. Nos. 2, 4.)
On November 20, 2018, attorney Michael K. Burke ("Burke")
entered an appearance on Henning's behalf in the criminal case.
(Id., Dkt. No. 7.) On November 27, 2018, at this Court's

---

[2] On June 24, 2019, Henning pleaded guilty to two counts of wire fraud.
(See United States v. Henning, 18 Cr. 859 (CS)). Henning's sentencing
is currently scheduled for January 14, 2020. (Id., Dkt. No. 19.)

suggestion, Golomb emailed a copy of the SAC to Burke and asked him whether Henning intended to appear in this action and whether Burke would accept service of papers relating to this action on Henning's behalf. (Hood Decl., ECF No. 79 ¶ 16.) Burke never responded to the message. (Id. ¶ 17.)

On January 16, 2019, Golomb requested the Clerk of Court enter a certificate of default against Henning, which the Clerk certified and filed later that day. (Id. ¶ 18; ECF No. 65.) On February 1, 2019, Burke left a telephone message with Golomb's counsel. (Hood Decl. ¶ 19.) A few days later, Burke inquired of Golomb about vacating the entry of default, but Golomb rejected Burke's request. (Id.) On June 10, 2019, Burke entered an appearance on Henning's behalf in this action and filed Henning's motion to set aside default pursuant to Federal Rule of Civil Procedure 55(c). (ECF Nos. 73, 74.) Golomb filed an opposition to the motion (ECF No. 80), and Henning filed a reply in further support (ECF No. 81).

### A. Legal Standard

Rule 55(c) allows a court to "set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). Because the Rule does not define the term "good cause," the Second Circuit has established three factors that must be assessed when deciding whether to relieve a party from an entry of default or from a default judgment: "(1) whether the default was willful; (2)

10

whether setting aside the default would prejudice the adversary;
and (3) whether a meritorious defense is presented." Enron Oil
Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993).  "Other
relevant equitable factors may also be considered, for instance,
whether the failure to follow a rule of procedure was a mistake
made in good faith and whether the entry of default would bring
about a harsh or unfair result." Id.  "The factors are to be
applied more forgivingly to an administrative default than to a
default judgment, because the concepts of finality and
litigation repose are less deeply implicated in the former."
Bank Leumi USA v. Ehrlich, No. 12-cv-4423 (AJN), 2014 WL
12661620, at *2 (S.D.N.Y. Feb. 18, 2014) (citing Enron Oil, 10
F.3d at 96).

    Relief from an entry of default is "left to the sound
discretion of a district court because it is in the best
position to assess the individual circumstances of a given case
and to evaluate the credibility and good faith of the parties."
Enron Oil, 10 F.3d at 95.  Good cause "should be construed
generously." Id. at 96.

## B. Analysis

The Court finds sufficient "good cause" to set aside the
Clerk's entry of default against Henning.

### 1. Willfulness

"A default should not be set aside when it is found to be

willful." Action S.A. v. Marc Rich & Co., 951 F.2d 504, 507 (2d
Cir. 1991) (refusing to set aside default judgment in an eight-
year-old case).  Although "[a] finding of willfulness is
typically enough to let an entry of default stand," W.B. David &
Co. v. De Beers Centenary AG, 507 F. App'x 67, 69 (2d Cir. 2013)
(summary order), "because defaults are generally disfavored and
are reserved for rare occasions, when doubt exists as to whether
a default should be granted or vacated, the doubt should be
resolved in favor of the defaulting party." Enron Oil, 10 F.3d
at 96.  "Willfulness," in the context of a default, "'refer[s]
to conduct that is more than merely negligent or careless,' but
is instead 'egregious and . . . not satisfactorily explained.'"
Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension
Fund v. Moulton Masonry & Const., LLC, 779 F.3d 182, 186 (2d
Cir. 2015) (quoting SEC v. McNulty, 137 F.3d 732, 738 (2d Cir.
1998)) (ellipsis in original).

Golomb argues that Henning's default must be deemed willful
because, not only was personal service accomplished by "nailing
and mailing" the complaints to Henning's permanent residence in
accordance with New York's law of personal service, Civil
Practice Law and Rules ("C.P.L.R.") § 308(4), Golomb also sent a
copy of the SAC to Henning's criminal defense counsel—who did
not timely respond—six weeks before it requested the entry of
default.  This is a close question, but the Court does not deem

Henning's conduct to be sufficiently egregious to constitute a willful default.

First, Henning has filed an affidavit swearing that he never encountered Golomb's process server and he never found papers relating to this action posted to the door of his residence. (Ex. A to Affirmation of Michael K. Burke, ECF No. 75-1.) Golomb counters that Henning's assertions fail to rebut the presumption of service because Henning does not actually state that he did not receive the process papers. Although the Court is skeptical that Henning was wholly unaware that Golomb had initiated a civil action against him, OpportunIP, and Marks Paneth, the Court resolves the issues in favor of Henning, especially where, as here, Henning merely seeks to vacate entry of default—not default judgment—and this action is still in its earliest procedural stage. See Enron Oil, 10 F.3d at 96; cf. Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc., 301 F.3d 54, 56, 58 (2d Cir. 2002) (per curiam) (affirming denial of a motion to vacate a 13 year-old default judgment under Federal Rule of Civil Procedure 60(b)'s less forgiving standard where—unlike this case—service was reasonably made on a corporate representative and—unlike Henning's affidavit—the defendant did not rebut key statements by the process server).

"A defendant's sworn denial of receipt of service . . . rebuts the presumption of proper service" where the defendant's

affidavit "swear[s] to 'specific facts to rebut the statements
in the process server's affidavits.'" Old Republic, 301 F.3d at
58.  Here, Henning's affidavit rebuts the process servers'
assertions that the FAC and SAC were posted to his door.
Henning, however, does not specifically rebut the process
servers' assertions that the documents were mailed.
Nevertheless, Golomb's focus on Henning's failure to deny that
he ever received the SAC (a) goes beyond the statements in the
process servers' affidavits; and (b) does not establish the
relevant issue: whether the default—not merely the lack of
service—was willful.  Henning's possible awareness of Golomb's
suit, and his failure to answer either complaint or to otherwise
respond, could be a significant factor from which the Court
might infer that his default was willful; but it does not prove
the point.  And, perhaps even more importantly, it does not
conclusively answer the fundamental question regarding whether
the Court should deny Henning the Second Circuit's "oft-stated
preference for resolving disputes on the merits." Enron Oil, 10
F.3d at 95.

        Second, although Henning did not expressly disavow
receiving the FAC or SAC by mail, Henning's actions, at this
early procedural stage, do not rise to the same level of
willfulness with respect to default as other cases that have
ruled against the defaulting party. See, e.g., Bricklayers, 779

F.3d at 186 (defendant "was aware of the legal action pending

against him and his company based on his own admissions");

McNulty, 137 F.3d at 734 (defendant "acknowledged receipt of a

copy of the complaint"); Action S.A., 951 F.2d at 507 (defendant

"admits he deliberately chose not to appear in the action

because he faced possible indictment upon return to New York");

State Farm Mut. Auto. Ins. Co. v. Cohan, No. 09-cv-2990 (JS),

2010 WL 890975, at *2 (E.D.N.Y. Mar. 8, 2010), aff'd, 409 F.

App'x 453 (2d Cir. 2011) (defendants, "[b]y their own admission,

. . . received a copy of the Summons and Complaint"); but see

Bank Leumi, 2014 WL 12661620 at *2 (finding "good cause" to

vacate entry of default even though the defendants willfully

defaulted by sending a letter to the court that stated: "we

shall no longer [be] able to appear in these proceedings").

Finally, Golomb's email to Henning's criminal defense

counsel does not establish that Henning's default was willful.

When the email was sent, Burke was not retained by Henning to

represent him beyond the scope of the criminal matter. (Reply,

ECF No. 81, at 4.) Further, Golomb did not receive any

indication that the message was received by Burke or shared with

Henning prior to the Clerk's entry of default. Accordingly, the

Court is wary of imputing service on a party to a civil dispute

merely because an email was sent, unsolicited, to an attorney

representing the party in a separate criminal action. Indeed,

Golomb does not allege or indicate that Burke was made aware the email had been sent by, for example, including a "read receipt" to the message that would have indicated if it was opened by Burke, or by placing a call to Burke to tell him that the email was sent to him.  The fact that Burke now represents Henning in this action also does not establish that Henning's default was willful or somehow strategic.  This is especially true where Golomb has offered no explanation for how Henning's default could have given him an advantage in the criminal action.

## 2. Prejudice to Plaintiff

Next, Golomb will not be sufficiently prejudiced by vacating the entry of default against Henning.  First, Golomb does not identify any prejudice that it will suffer, aside from delay and duplicative efforts that it will have to undertake to litigate against both Marks Paneth and Henning.  "[D]elay standing alone does not establish prejudice." Enron Oil, 10 F.3d at 98.

Second, on January 16, 2019, and February 6, 2019, Golomb requested and obtained certificates of default against Henning and OpportunIP, respectively.  (ECF Nos. 65, 72.)  Golomb, however, has never moved for default judgment against either defendant.  "The fact that plaintiff waited over [nine months] before seeking such relief strongly suggests that some further delay will not unduly prejudice it." Enron Oil, 10 F.3d at 98.

### 3. Meritorious Defense

"A defendant seeking to vacate an entry of default must present some evidence beyond conclusory denials to support his defense." Id. "[T]he defendant need not establish his defense conclusively, but he must present credible evidence of facts that would constitute a complete defense." State Farm, 409 F. App'x at 456 (summary order) (citing Enron Oil, 10 F.3d at 98).

Henning does not expressly offer a complete defense to the SAC's numerous and detailed allegations against him, but the Court notes that if he is successful on the defenses that he has asserted, the Court likely lacks subject matter jurisdiction over Golomb's remaining claims. Accordingly, Henning has offered a sufficiently complete defense, for now.

Henning first cites the Agreement's arbitration clause which, as discussed below, required Golomb to attempt to resolve this dispute through non-binding arbitration before initiating this action. This is no defense to Henning individually, however, because Golomb served an arbitration notice on OpportunIP, the entity on whose behalf Henning was acting under the Agreement. (Hood Decl. ¶¶ 2-7.) Further, because "[i]t is common ground that 'signing an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally,'" Boey Chau v. W. Carver Med. Assocs., P.C., No. 06-cv-0526 (JFB) (MLO), 2006 WL

3780546, at *2 (E.D.N.Y. Dec. 21, 2006) (quoting <u>McCarthy v.</u>
<u>Azure</u>, 22 F.3d 351, 361 (1st Cir. 1994)), Henning cannot now
invoke the arbitration clause as a shield to the SAC's claims
against him for fraudulent conduct that he allegedly perpetrated
in his individual capacity (among other, alternatively pleaded,
capacities).[3]

Next, Henning argues that he has meritorious legal defenses
to Golomb's claims for lost profits and the professional fees it
incurred to fortify its IP.  The Court agrees.  First, the "out
of pocket" rule of <u>Reno v. Bull</u>, 124 N.E. 144 (N.Y. 1919), and
its progeny, limits Golomb's damages for fraud to its actual out
of pocket expenses. <u>See also</u> <u>Lama Holding Co. v. Smith Barney</u>
<u>Inc.</u>, 668 N.E.2d 1370, 1373 (N.Y. 1996) ("Damages are to be
calculated to compensate plaintiffs for what they lost because
of the fraud, not to compensate them for what they might have
gained.").  Accordingly, the SAC's lost opportunities claim may
not be recoverable because the tortious conduct that underlies
each of Golomb's causes of action centers on Henning's
fraudulent acts.

Second, Henning argues that he is not liable for Golomb's
professional fees because the Agreement included a "grant-back"

---

[3] As discussed below, Golomb's claims based on Henning's conduct as the
Marks Paneth Partner-in-Charge of Advisory Services are subject to the
Agreement's arbitration clause.  These claims, however, are against
Marks Paneth—not Henning.

clause that specifically allowed Golomb to market, sell, and
license its IP to any interested purchaser or licensor.
Therefore, Henning argues, Golomb was free to market its IP on
its own, and Golomb cannot prove that Henning's
misrepresentations caused it to suffer any damages for fees
that, in the ordinary course of business, Golomb would have
incurred to protect its IP.

Third, although Henning has not asserted any defense to the
SAC's attorneys' fees claim that Golomb alleges it paid to
evaluate and negotiate a false agreement that Henning drafted,
the Court observes that it is highly improbable that such fees,
standing alone, are in excess of the required $75,000 amount in
controversy necessary to establish diversity jurisdiction. See
28 U.S.C. § 1332(a). Further, the Court notes that Golomb's
claim for professional fees also may be insufficiently pleaded
to "prov[e] subject matter jurisdiction by a preponderance of
the evidence," Liranzo v. United States, 690 F.3d 78, 84 (2d
Cir. 2012), because Golomb does not allege facts that establish
how its professional fees claim meets the $75,000 threshold.

Finally, refusing to allow Henning to rejoin these
proceedings at this early procedural stage "would bring about a
harsh or unfair result," Enron Oil, 10 F.3d at 96, because this
action is still in the pleading stage, and, as discussed below,
it will be stayed pending arbitration between Golomb and Marks

Paneth.  Accordingly, in light of this Circuit's "strong preference for resolution of disputes on their merits, and our preference for resolving doubts in favor of a trial on the merits," Sony Corp. v. Elm State Elecs., Inc., 800 F.2d 317, 320 (2d Cir. 1986) (citations omitted), the Court finds sufficient "good cause" to vacate the entry of default against Henning pursuant to Federal Rule of Civil Procedure 55(c).

### III.  Marks Paneth's Motion to Dismiss

On October 12, 2018, Marks Paneth moved to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b).  (ECF No. 52.)  Marks Paneth argues that the SAC does not plausibly allege wrongdoing by it or a claim against it upon which relief may be granted or, alternatively, that this action should be stayed pending arbitration in accordance with the terms of the Agreement.

### A.  Subject Matter Jurisdiction

"When the Court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether the Complaint states a claim." Minnie Rose LLC v. Yu, 169 F. Supp. 3d 504, 512 (S.D.N.Y. 2016).  Accordingly, the Court first addresses Marks Paneth's Rule 12(b)(1) lack of subject matter jurisdiction defense.

In a footnote, Marks Paneth asserts that complete diversity

may not exist because Golomb is a citizen of Illinois (among
other states) and there is evidence that Henning works in the
Illinois office of a company called Global Economics Group.
(Mem., ECF No. 54, at 8 n.5.)  "It is well-settled that the
party asserting federal jurisdiction bears the burden of
establishing jurisdiction, and it must prove jurisdiction by a
preponderance of evidence." Platinum-Montaur Life Scis., LLC v.
Navidea Biopharmaceuticals, Inc., No. 18-3535-CV, 2019 WL
6258632, at *3 (2d Cir. Nov. 25, 2019) (internal quotation marks
omitted).  Here, the Complaint alleges that Henning is a
resident of and citizen of Connecticut.  (SAC ¶ 7.)  Further,
Henning's affidavit in support of his motion to set aside
default states that, at the time the SAC was filed, Henning
maintained a permanent residence in and resided in Connecticut.
(ECF No. 75-1.)  Accordingly, Golomb has proved by a
preponderance of the evidence that complete diversity exists
pursuant to 28 U.S.C. § 1332(a).

As discussed above, the Court notes that Golomb's
attorneys' fees and professional fees claims may not be
sufficiently pleaded to establish the required $75,000 amount in
controversy.  However, because no defendant has introduced
competing evidence which would establish that the attorneys'
fees and professional fees are less than $75,000, and Golomb has
alleged that it incurred "damages in the amount of hundreds of

thousands of dollars in professional fees" (SAC ¶ 71), Golomb

has proved by a preponderance of the evidence that the amount in

controversy exceeds the required $75,000 threshold.

## B.  Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a

complaint must contain sufficient factual matter . . . to 'state

a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when

the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for

the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

On a motion to dismiss, the Court must accept the factual

allegations in the complaint as true and draw all reasonable

inferences in the plaintiff's favor. Chambers v. Time Warner,

Inc., 282 F.3d 147, 152 (2d Cir. 2002).  "[T]he purpose of

Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a

streamlined fashion, the formal sufficiency of the plaintiff's

statement of a claim for relief without resolving a contest

regarding its substantive merits.'" Halebian v. Berv, 644 F.3d

122, 130 (2d Cir. 2011) (quoting Glob. Network Commc'ns, Inc. v.

N.Y.C., 458 F.3d 150, 155 (2d Cir. 2006)).

In addition to the requirements of Rule 12(b)(6), a

complaint alleging fraud must satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b) by stating
the circumstances constituting fraud "with particularity."
United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25 (2d
Cir. 2016).  The adequacy of particularized allegations under
Rule 9(b) is "case- and context-specific." Espinoza ex rel.
JPMorgan Chase & Co. v. Dimon, 797 F.3d 229, 236 (2d Cir. 2015).

### 1.  Alter Ego Liability

#### a.  Legal Standard

Golomb alleges that Marks Paneth is liable for Henning's
and OpportunIP's fraudulent acts because OpportunIP was the
alter ego of Marks Paneth.  Under New York law, the
determination of whether to pierce the corporate veil is
governed by the law of the company's state of incorporation. See
Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995).
Because OpportunIP and Marks Paneth are New York entities, the
Court applies New York law to whether Marks Paneth may be liable
for alleged wrongdoing by OpportunIP.

"[T]o pierce the corporate veil under New York law, a
plaintiff must prove that '(1) [the owner] ha[s] exercised such
control that the [corporation] has become a mere instrumentality
of the [owner], which is the real actor; (2) such control has
been used to commit a fraud or other wrong; and (3) the fraud or
wrong results in an unjust loss or injury to plaintiff.'"
Freeman v. Complex Computing Co., 119 F.3d 1044, 1052 (2d Cir.

1997) (citing <u>Wm. Passalacqua Builders, Inc. v. Resnick</u> <u>Developers S., Inc.</u>, 933 F.2d 131, 138 (2d Cir. 1991)) (alterations in original).  The corporate veil may be pierced "when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." <u>Bridgestone/Firestone, Inc. v.</u> <u>Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 17-18 (2d Cir. 1996) (quotation marks omitted; alteration in original).

Factors to be considered when evaluating whether control or domination is sufficient to pierce the veil include, <u>inter alia</u>: "the absence of the formalities and paraphernalia that are part and parcel of the corporate existence;" "overlap in ownership, officers, directors, and personnel;" "common office space, address and telephone numbers of corporate entities;" "whether the related corporations deal with the dominated corporation at arms length;" "whether the corporations are treated as independent profit centers;" and "whether the corporation in question had property that was used by other of the corporations as if it were its own." <u>Passalacqua Builders</u>, 933 F.2d at 139. "New York courts have recognized that a veil-piercing theory often necessitates a 'fact laden inquiry' and thus is 'unsuited for resolution on a pre-answer, pre-discovery motion to dismiss.'" <u>City of Almaty v. Ablyazov</u>, 278 F. Supp. 3d 776, 799

(S.D.N.Y. 2017) (quoting <u>Holme v. Glob. Minerals & Metals Corp.</u>, 880 N.Y.S.2d 873 (Sup. Ct.), <u>aff'd</u>, 63 A.D.3d 417 (1st Dep't 2009)).

### b. Analysis

Drawing all reasonable inferences in favor of Golomb, the SAC plausibly pleads alter ego liability against Marks Paneth: namely, that OpportunIP was so dominated by the Marks Paneth Advisory Services and its Partner-in-Charge, Henning, that OpportunIP was a "mere instrumentality" of the Advisory Services practice.

First, the SAC alleges that Advisory Services provides the same types of services that Henning and OpportunIP are alleged to have fraudulently provided to Golomb, <u>i.e.</u>, advising IP owners about the value of their IP and its potential monetization through sale or license to third parties. (SAC ¶ 14.)

Second, the SAC alleges that Marks Paneth formed OpportunIP specifically for the purpose of promoting Henning's idea to create an intellectual property exchange, and, after divesting its own interest in OpportunIP, Marks Paneth nevertheless assigned its member interests to individual Marks Paneth partners. (<u>Id.</u> ¶¶ 18, 21.) This gives rise to the inference that the Marks Paneth partnership had a stake in OpportunIP and was invested in its success.

Third, the SAC alleges that, not only was Henning's fraudulent conduct within the course and scope of his duties as the Partner-in-Charge of the Advisory Services practice (id. ¶ 74), Henning and Sacks also portrayed Marks Paneth and OpportunIP as a single entity (id. ¶¶ 28-29, 36).  Indeed, such overlap between the businesses was further impressed upon Golomb by Henning and Sacks's sales pitch which emphasized how Marks Paneth could help Golomb monetize its IP (id. ¶ 31), as well as other indications of a close relationship between the two entities, such as their shared offices, equipment, and employees, and Henning's predominant use of his Marks Paneth email account and telephone when communicating with Golomb (id. ¶ 77).

Marks Paneth cites Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd., 622 F. Supp. 2d 46 (S.D.N.Y. 2009), to argue that Golomb's alter ego claims may be dismissed at the pleading stage where the complaint does not allege specific facts for many of the Passalacqua Builders control factors.  The Court disagrees. Arctic Ocean was a decision involving application of admiralty law in which the plaintiff was required to satisfy the heightened pleading standard of Rule E(2)(a) of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure. See 622 F. Supp. 2d at 52-53, 54.  Here, not only does Golomb not have such a heightened pleading burden,

but, as discussed above, the SAC alleges facts that plausibly indicate sufficient control over OpportunIP by Marks Paneth's Advisory Services.

Finally, Marks Paneth's argument that it cannot plausibly be the alter ego of OpportunIP because it has filed a separate lawsuit against OpportunIP is equally unavailing. If such a lawsuit were grounds to dismiss an alter ego claim, a defendant could avoid liability merely by initiating such an action against the purported alter ego entity.

Accordingly, "[a]lthough the factual allegations are not detailed, they are sufficient under Federal Rule of Civil Procedure 8(a)'s liberal pleading standard . . . to show the domination or control necessary to pierce the corporate veil and to afford [Marks Paneth] notice of the basis for liability. Considering the fact intensive nature of this inquiry, [the SAC's] allegations are sufficient at this pre-discovery stage to withstand dismissal of the alter ego claim." Network Enterprises, Inc. v. APBA Offshore Prods., Inc., No. 01-cv-11765 (CSH), 2002 WL 31050846, at *4 (S.D.N.Y. Sept. 12, 2002) (collecting cases).

## 2. Arbitration

Marks Paneth argues that the SAC was improperly filed without submitting the dispute to arbitration. The Court agrees.

> [U]nder principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of "the relationship among the parties, the contracts they signed . . ., and the issues that had arisen" among them discloses that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."

JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 177 (2d Cir. 2004) (quoting Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271 F.3d 403, 406 (2d Cir. 2001)) (ellipsis in original).

The SAC's claims against Marks Paneth arise from Henning's fraudulent actions when marketing Golomb's IP according to the terms of the Agreement between Golomb and OpportunIP. The Agreement includes an arbitration clause that clearly and unambiguously requires "any controversy or claim arising out of or relating to this Agreement . . . shall be submitted to non-binding arbitration . . . before the parties may initiate . . . litigation." (License Agmt. at 4 § 6.2.) Accordingly, Golomb was required to first submit its alter ego claims against Marks Paneth to arbitration before initiating this action against it.

Golomb counters that Marks Paneth cannot invoke the arbitration clause because Golomb served an arbitration demand on OpportunIP at OpportunIP's address—which happens to be the same address as Marks Paneth's headquarters. (Opp., ECF No. 55, at 6 n.4, 9.) As a result, Golomb argues, Marks Paneth's "hands

are not clean" because it was fully aware of the arbitration demand, but it nevertheless refused to accept the demand on behalf of OpportunIP. (Id. at 9.) The SAC, however, does not allege that Golomb demanded arbitration specifically with Marks Paneth. Accordingly, because there is no allegation that an arbitration demand was served on Marks Paneth, and Golomb's claims against it arise from the Agreement to which Golomb is a signatory, Marks Paneth is within its rights to demand a stay of these proceedings pending resolution of Golomb's alter ego claims in non-binding arbitration. See Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the [Federal Arbitration Act] mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").

## IV. Conclusion

For the above-stated reasons, Henning's motion to set aside default is GRANTED. The Certificate of Default docketed at ECF No. 65 is VACATED.

Marks Paneth's motion to stay these proceedings pending arbitration in accordance with the terms of the Agreement is GRANTED. Within three days of the termination of such arbitration, the parties shall notify the Court by filing a joint letter on the docket. The remainder of Marks Paneth's motion to dismiss is DENIED, without prejudice, as moot.

The Court notes that a certificate of default was entered against OpportunIP on February 6, 2019.  (ECF No. 72.) Accordingly, Golomb is directed to move for default judgment against OpportunIP at its earliest convenience, but no later than 30 days after the stay is terminated.

The Clerk of Court is directed to stay these proceedings and terminate the motions docketed at ECF Nos. 52 and 74.

**SO ORDERED.**

Dated:   New York, New York
         December 12, 2019

                                      John F. Keenan
                              United States District Judge